May it please the Court, John Daly for the Appellant to the Federal Trade Commission. Your Honor, this case involves two major issues, both of which are very important to the Federal Trade Commission, in being able to get full and effective relief in a case like this involving widespread deceptive practices by a multiplicity of players. I'll turn first, if you will, to the claim preclusion issue. As your Honors know, we brought this case in two parts. We first went after the informant defendants, the people who were actually selling the products in question. We did that quickly to try and get a quick settlement, which had the very beneficial effect of getting the infomercials off the air, stopping the continuing consumer harm that was going on. At that point, we were still investigating the roles of the other people involved in it, people who were involved essentially in an ad agency and an endorser. And we didn't know at that point all the facts about those people's activities, but we continued quite quickly. Now, what the district court did is it decided that there was claim preclusion or collateral, I'm sorry, res judicata, on the theory that these entities were in privity with each other. In our view, that takes the concept of privity far beyond how it has been used previously in a way that really is contrary to basic principles. What the district court relied on was the mere fact that these were parties that acted together to bring about a result. Now, we certainly admit, in fact, that we advocate that they did work closely together. But this really makes them no more than joint tort defeasors. And the general rule remains that if people collaborate on a tort, you can sue them one at a time. If two people collaborate on an article that defames me, I can sue them. I don't have to do it all at once. MS. GOTTLIEB Let me tell you what my issue is. What you said makes sense, but I think that the district court relied, with respect to modern interactive, on more than the fact that they were joint tortfeasors enacting together. My question is this, is that you have you first have the major settlement, and you have a settlement document that binds, you know, agents, assigns, et cetera, et cetera. Like every lawyer, you know, known and unknown, dead and alive. Every parallel thing you could think of, you put in there, right? Okay. And then your answer in the brief is, well, but that's just the kind of parallel language like we see in Rule 65 and injunctions. Well, my question is, what is the meaning of that settlement? For example, if modern interactive had gone out and put out some more exercise in a bottle ads, would they have been in violation of that consent decree? MR. BROOKS If they did it in concert with the informant defendants, yes. MS. GOTTLIEB Well, what if they just did it? In other words, maybe they didn't get the gist of it, and they continued. They made ad buys or whatever, and they kept putting out. Would they not be in violation as an agent? MR. BROOKS We would deny that there was ever an agency relationship here. Modern interactive was very much involved in the operation, but they remained independent contractors. I don't think their function can equate to agency under common law principles. I mean, they certainly would be.  GOTTLIEB So in other words, but the bottom line is that if they were out there doing something in violation of the consent decree, they would be held in contempt of the decree, would they not? MR. BROOKS Right. Only if they were acting in concert with the informant defendants. That's how the decree was written, which really does just parallel. MS. GOTTLIEB Right. But that kind of gets you back to that. It makes it sound a lot like privity under the flexible notions of privity. MR. GOTTLIEB But I think it's important to remember that, as this Court said in the city of Seattle, privity is a kind of relationship that makes it fair to bind the privy. Now, how would the modern interactive defendants have been bound here? Would they have been bound to pay the $10 million? It's difficult. It's impossible to imagine that. I mean, what happened here is, yes, of course they were bound, as anyone in the world would be bound under Rule 65, not to act in concert with informant to be selling this stuff. But there's no way that we could have held them responsible for the $10 million. And that's what privity would really mean.  GOTTLIEB Well, but that, I guess, assumes that you have to have 100 percent parallelism in the privity. And the question I have is whether – I don't think they would be held liable for the fine as I read the settlement agreement. But then that wasn't their role in this relationship. Why isn't their role in acting in concert with informa – why aren't they in privity with them vis-à-vis the representations or misrepresentations? If you find privity here, it's entirely one-sided and non-mutual because all we get against the modern interactive defendants is the very same thing we get under Rule 65. They, on the other hand, in this relationship, would get off scot-free. We never had any opportunity to get any financial relief against them. And despite – the mutuality remains very much the rule for res judicata as opposed to collateral estoppel. And the cases that the appellee cites in the brief say this. I mean, for example, the Nevada versus the United States case, they cited it as saying, well, there are exceptions to non-mutuality of collateral – I'm sorry, res judicata. The Supreme Court was very clear in the case – that was a water rights case. And the Supreme Court was very clear in that matter to say this is essentially an in rem action. If you're going to settle water rights involving Indian tribes and the United States, it has to bind the entire world. So this concept of mutuality remains very vital. And the fact is that we get nothing from these defendants that we wouldn't have under Rule 65. Let's take the new trial or the new proceeding. If the district court is wrong with respect to privity and now Modern Interactive is on the hook for your allegations, isn't it essentially informa standing in the shoes of Modern Interactive that you're fighting with again? Because of the indemnification? Well, but one, because of the indemnification and because every representation is parallel. The representation is in the ad? The representation is in the ad a parallel. But what is different among the various players here is what they knew and what kind of substantiation they had. I mean, our whole point here – and this, of course, gets into the endorser standard – is that our notion – and, of course, the courts have recognized for decades that it's not just the seller of the product that can be held liable. There are many ad agencies cases, not as many endorser cases. But the concept behind this is what the Federal Trade Commission Act bans is deceptive practices. So one asks oneself, what is the deceptive practice? And in the case of an ad agency, our answer, which the courts have accepted, is the ad agency engages in a deceptive practice if it makes representations without reasonable substantiation. Now, that doesn't mean it has to have the very same substantiation that the developer of the product has. And that is perhaps even more so for the endorser. But each player, if there's to be individual responsibility for these actions, each player has to have some sort of substantiation commensurate with his or her position in the matter. So with respect to the modern interactive defendants, obviously these are advertising professionals. We would expect them to have substantiation for these very extravagant claims. I mean, I think I barely need to mention the kinds of claims that are made here. Well, is it possible, for example, that we wouldn't need to even reach privity if we agreed with you on the identity of the claims or the lack of identity? That's true. Yes, absolutely, Your Honor. In other words, because the knowledge factor with respect to the manufacturer or company is a different standard than it is for the ad agency. Is that correct? And that's why we have to Is knowledge the only substantive difference in those claims? Knowledge and other indicia of involvement, the substantial nature of their involvement in making these deceptive claims. Mr. Daly, is it clear that modern interactive got actual notice of this settlement? This binds agents, officers, servants, employees, attorneys, and so on, who receive actual notice of this order by personal service or otherwise. Is that undisputed, that modern interactive had actual notice? I believe it is, but in our view, Your Honor, that explains why that language is only prospective in its application. Of course, once modern interactive got knowledge of this order, then going forward they would be bound the same way anyone else would, frankly, under Rule 65. But that language itself, it can't logically be applied to the prior actions. I mean, obviously, modern interactive did not, could not have had notice of this order during the preorder time that we're talking about the financial liability being based on. Were they involved in negotiations of the order? No, sir. The stipulation? No, sir, no. The order was negotiated with the informed defendants. And as we point out, you know, we told them, you know, that we are still looking at other people who are involved in these actions, and we realize that you have indemnification agreements with people, and, you know, we are going to continue to investigate such other persons. But let me ask you about that. I know you wouldn't agree that the consent decree would settle modern interactive, but whether or not you told them that you might be going after other people, that wouldn't, in fact, change whatever the plain language of the consent decree is, one way or the other. Absolutely, Your Honor. So what, where does that argument get us? Well, it gets our first position with regard to the decree is the decree itself said that we are reserved the right to seek further relief. Now, this is an agreement between the Federal Trade Commission and these parties. The only other relief, realistically, that the Federal Trade Commission could seek is the very kind of relief we're talking about here, relief against other people. So, yes, I agree. You only go to the plural evidence if there's some ambiguity there. But we think the agreement itself shows that. Kind of background information. Yes. Okay. Absolutely, Your Honor. Absolutely. Were you aware at the time that you were negotiating this that Informa had an indemnification agreement with Modern Interactive? Yes, sir. And was there any discussion during those, during the negotiations as to whether this consent decree would cover Modern Interactive or not? As Mr. Winston's declaration in the record shows, it says we approached and said we know there are indemnification agreements, but we are still investigating other people, other such people who may be involved in this. Now, they chastised us for not naming names. The fact is, you know, we're a government agency. We live by rules, and the rules say you don't name names of nonpublic investigations. That's a little bit. Are there other parties that have indemnification agreements with Informa that are not, that were not sued either in the order of Modern Interactive? No, sir. No. These were the obvious additional. If we were going to do anything else, it would be this. And that's what they don't seem to understand or be willing to recognize, that they criticized us for not naming names, but it was no one else we could have been going after. And the practical result, I mean, basically the events that precipitated this have stopped, correct? Well, there are. Well, aside from maybe you have some continued. We have continued proceedings going on, but yes. So the practical result is to try to get more money? That's the primary practical result. But remember, there's also other kinds of relief that we could seek from these defendants. You know, for example, Mr. Garvey. We could seek from him, and this, of course, would be within the discretion of the district court, we could seek a fencing order that would preclude him from engaging in other endorsements for other people. And that's, that in itself is another reason why the claims are different here, because for both Mott and Interactive and Garvey, we could seek further relief of this sort that we never had the opportunity to do because we didn't sue them. We were still investigating them. You know, one thing I'd like to point out. Can I just add another question? Sure. Do you think that the, when you're looking at whether there's an identity of claims, that that encompasses the scope of relief? Because it seems to me you might be mixing and matching principles there. Not really for the same action, but this would be relief for a different action. We would have to prove that Mott and Interactive itself was doing things in a way that made it, you know, personally or corporately liable, and therefore we would be entitled to further relief. What evidence do you have of that? Excuse me? What evidence do you have of that? There are pervasive involvement in writing the scripts, producing the infomercials, and then, of course, you know, all of these parties, both Mott and Interactive and Garvey, I mean, they obviously have knowledge of the claims that they are making, and, you know, the claims, as we point out, are quite extreme. They're saying you can eat all of these so-called forbidden foods and not worry about the weight. Sounds good to me, actually. It sounds good to all of us. I would urge your honors to take a look at the video. It will not only confirm the transcript, but the overall feel it gives you, I think, I emphasize it, the one thing you will see in the video that you don't see in the transcript, are all these swimsuit-clad models of both sexes snarfing down pizza and chocolate cake. The overall message of this is quite clear. You can eat what you want. And beyond that, Mr. Garvey himself specifically made several representations that go to weight maintenance. And this, of course, is a key claim in diet product advertising because it's the one problem that everyone has. And time after time, within the infomercial, Mr. Garvey says, you've been waiting to break the diet cycle experience for the freedom from food once and for all. You may never, ever, ever diet again, freed forever from the endless cycle of dieting and guilt. If you look at the extremely meager substantiation that Mr. Garvey says he has, you will not find an iota of support for any of these maintenance claims, which are a very important part of the claims that were made during these infomercials. To turn very — He did talk to people. He talked — Around the product. He talked to people, Your Honor. He used it himself for about two or three weeks, and I — That's eight pounds. Yeah, in two or three weeks. And regardless, I mean, that certainly is no scientific proof, and he seems to acknowledge that. But it certainly is no proof for weight maintenance. And just because you use a product for three weeks and you lose a few pounds, it tells you nothing about how people with ongoing weight problems, which are obviously the target audience for this advertisement, how they will ever be able to get any sort of long-term, you know, benefit from the product. There were no scientific studies done. Mr. Garvey, in the admissions that you'll see in the pretrial order, admitted that he was unaware of any scientific studies on these products. When he did point to some meager evidence that he says he looked at on the set, through these two documents, you'll see that one of them talks about dietary fiber as generally trapping some fat. Well, they talk about dietary fiber generally. There's no quantification. And not once does it mention chitin or chitosan, which they are selling as the miracle cure. They're just saying, well, if you eat a lot of fiber, you may not digest all your fat. Fine. Similarly, the other product, there's no ‑‑ it wasn't tested on ‑‑ I'm sorry, there was no evidence of any metabolic effect. You're not trying to sell that product now, are you? What? I'm not trying to sell the product. I'm trying to sell the notion that consumers should get full relief when products like this are put on television and some understandably hopeful people buy this stuff. I mean, this obviously goes to people's fondest desires, and they wrap it up. I mean, it's not just, you know, so‑called the dumbest consumers who are buying this stuff. They wrap this up in a facially convincing image. They get this woman on who's supposed to be a nutritionist. She's not a nutritionist. She's an actress. They get a professional baseball player who talks about the importance of fitness, and they have these very plausibly, you know, sort of pseudoscience theories about how this stuff might work with no real proof behind it. I mean, this is snake oil, Your Honors, and we think it's important that we should be able to go after all the participants to get full relief on this. I mean, the endorser issue, I think, is very important. Yes, it's true. We haven't brought a lot of endorser cases over the years, but we don't see that many cases that fall into this category. We think this case does set an important precedent and truly will. We think that someone in Mr. Garvey's ‑‑ we're not asking Mr. Garvey to be a scientist. We understand that he's a ball player, but he's certainly an intelligent layman who's done well in business. He can look at some materials and say, can we really be saying this? I mean, is there really anything here to support these really extravagant claims we're making? He talks to some people, and he uses it. What would he have to do? Go commission an independent study? I think he could question them as to whether they had commissioned a real study. Maybe he could hire someone to translate. Maybe the FTC ought to put out some guidelines. Actually, we're doing so, Your Honor. Are you? As a matter of fact, yes, for the benefit of not only endorsers but even publishers. We are putting out guidelines. You pick up the paper like today. Here's Tiger Woods with LASIK. All of a sudden, he's got these great eyes. And then you see ads all the time. Sex for life, you know. Have you checked into that one? I think we're looking at those. In terms of the dollars, Your Honor, diet is a very big one. In fact, we have put out we're in the process of putting out information not only for the benefit of publishers. Look at Dr. Atkins. What happened to him? You know, there's a big range. And what everyone thinks of Dr. Atkins, he had a respectable scientific theory that is light years away from the sort of thing that was going on here. Mr. Daly, is Mr. Garvey on the hook only if he falls within the commission's guidelines for an endorser as opposed to a spokesman? No, sir. We have two theories. We've emphasized mostly the endorser theory. He clearly is an endorser under the guidelines because contrary to the supposition of defendant's expert, the guidelines specifically say that you are an endorser if you say you're expressing your personal beliefs. You don't have to be an expert. You don't have to be a user. And Mr. Garvey did. You don't have to be a user to be an endorser. Correct, Your Honor. That's quite clear in the guidelines. Now, Mr. Garvey did say that he was a user in some of the other spots, the other television spots that he did. But within the infomercials, time after time, he makes it quite clear, I truly believe this is the greatest stuff ever. So to say that you're expressing an honest belief is not under the guidelines. Although the district court finds that Mr. Garvey comes across in these infomercials as sort of a skeptic who is persuaded by the end of the half hour after speaking with a nutritionist and watching the evidence that's presented in the course of the infomercial. Well, in the first place, he is persuaded by the end of the half hour. And in the second place, even a viewer of any moderate intelligence is going to know that the whole thing was scripted in advance. And if by the end he's saying, I truly believe this, that he must have some basis for truly believing this. It's more than just the half hour of his being won over. I think the reasonable consumer that looks at this is saying, look, this is Steve Garvey. This is a professional athlete who's telling me that he truly believes, those are his words, that this stuff works. He's got to have some reason for that. And the fact is, Your Honor, that he didn't have some reason for that. He had nothing. And we think that he should be all we're seeking. We're not seeking from him to make consumers whole. We're just saying he made a million, he and his company made a million dollars off of this endorsement, 1 percent of the gross. We're saying that money should be disgorged. We'll give it to consumers if we can, disgorge them if we can't. Thank you very much, Your Honor. Thank you. May it please the Court. Edward Glenn for the appellees in this matter. As the Court realizes, there are really two different, totally different sets of issues here. There are the raised judicata issues and the liability of an endorser type issues. I'm going to deal with the raised judicata issues first. I think there's a significant issue that was raised by the Court, and that is, what is the situation with respect to modern media under the INFORMA decree? And that is specifically addressed by Judge Feist in his opinion, in the footnotes. As the Court notes, that in addition to arguing that these defendants are in privity with INFORMA, defendants have actively contended that the settlement's terms apply with equal force to Richmond, Levine, and modern media. As a result of adopting that position, these defendants would be judicially stopped from objecting to the FTC's ability to bring a contempt action for any violation of the settlement's terms. Why didn't INFORMA, which had indemnification agreements with Garvey and with Modern Interactive, make sure that they were included by name in this agreement? Your Honor, I This is pretty oblique if this was your intention that this consent decree cover them. Why wouldn't you do that explicitly when you knew you were on the hook for any actions that might be brought against them? Weren't you aware? Were you not listening when the FTC said that they were still investigating this? Yes, Your Honor, I was listening. This debate about what kind of notice that the FTC gave was actively considered by Judge Feist in the court below. Their arguments were rejected by him. If you look at the argument by my colleague here that the only possible notice that we could be getting is that modern media was a potential target is flatly wrong. That is not supported by the record. And frankly, for me to go into the other targets that would be out there, I'd be outside the record as well. I can represent to the court that there were a bunch of people selling this product on the Internet. There were all kinds of issues that had come up when the selling of the product was stopped. But in order to clarify all of that, I mean, did it at any point did you say maybe you couldn't say who do you have in mind, but you certainly could say, well, we're not going to be on the hook for $10 million and for an injunction and basic contempt fee unless everybody that we're indemnifying is covered by this. And that means Garvey and it means Modern Interactive. We want their names in this agreement. Well, they were not in the agreement, Your Honor. It was not the primary subject of discussion. The primary subject was, frankly, the money, and the $10 million that was required to be paid was very, very substantial. It was not clear until late in the game that the money could be put together and that sort of thing, and that was the primary subject of concern. We think that the decree, which was essentially presented by the Federal Trade Commission almost on a take-it-or-leave-it basis. Did you represent Informa? I did. And I presume now as through the indemnification series, that's why you're now representing Modern Interactive. That is true. With respect to Modern Interactive, it seems to me that one of the real issues here has to do with the identity of the claims because it would be entirely conceivable that you would have a primary target of an FTC investigation that would get shut down, but that an advertising agency or other collateral might not actually be on the hook for any kind of fines or injunction because of the knowledge issue, and there's a range of knowledge and participation that they might have. How do you respond to the argument that the FTC has made that actually these claims are not parallel claims, that the Act permits different kinds of actions against different kinds of individuals or entities? I think, Your Honor, to the extent that the Ninth Circuit rule is related to the common nucleus of operative facts, I believe that's the phrase that is used in several of the cases, it is impossible to lay the complaint in the Informa action, which is in the record, alongside the complaint against the Garvey and Modern Media defendants without being struck by the absolute parallel symmetry of the allegations in the two. No fair reader could take a look at those two complaints without being struck by the fact that there was heavy reliance on what was already on the record. Why doesn't that just suggest that they're joint tortfeasors, that they are participants individually liable in the same action? Well, the joint tortfeasor analogy, Your Honor, only goes so far because what they were, were common creators of a document that is the script, or ultimately the television commercial, which gave rise to the FTC claim. After all, the essence of the FTC claim is that the advertising was either false or unsubstantiated. And it is absolutely clear from the facts that the two worked very closely together in that regard. I am struck by the appropriateness of the reliance on the Davis-Wright case that I believe is cited by Justice Breyer in his opinion. And essentially the facts there, it's a district court case, but I think it's rather compelling. What you have is an insurance company suing a defendant for improperly procuring through fraud the issuance of an insurance policy. Tried to a jury, the defendant wins. The plaintiff goes back and then sues the law firm for the defendant in the first action, saying you assisted them in the procuring of the insurance policy. Held, res judicata is appropriate, because the two claims arise out of the same nucleus of operative fact. Now, did the defendant and the law firm do exactly the same thing? No, they didn't. But did they work together to procure the issuance of the insurance policy? Absolutely. And that's why I think that that's an appropriate analysis for the court in this case. We've stuck Judge Rostein, but we're not bound by district courts. And I have not seen any circuit court, including the Ninth Circuit, give privity the kind of nuance that Judge Rostein did in the Davis-Wright case. Maybe there is something I'm missing. I mean, what we're kind of stuck with is this Lake Tahoe, which is not all that helpful when we're to anybody. But do you know of any other circuit court that has taken privity to that level? Your Honor, that was the one that was the closest. I think that what we have here is a, to use a phrase from the previous argument, almost a totality of the circumstances test, almost, is it fair, is it appropriate? What we have is common nucleus of facts, exactly parallel claims. We've got the indemnitore indemnity issue. So that, in fact, what this really is about is the FTC trying to get more money than the $10 million that they've already received from information. Let me stop you on that. That's true as a practical matter. I'm trying to figure out the legal significance of that. You could say, well, that seems a little unfair because we're on the hook twice. Well, we already settled with these guys, and now they're back at it, and we're the ones, it's our pocketbook that's paying. So I understand totally the pain. But I'm really having some trouble understanding the legal significance of that. Maybe you can enlighten me. Well, there are cases that have said in looking at privity, one of the, there's almost a checklist that you go down, one of the potential items on such a checklist would be an indemnitore indemnity relationship. It is not certainly, actually even something that Judge Feist particularly relied on. It is, however, something that the cases do point out as a potential plus factor in the, in a determination of the existence of privity. I think in my view, the strongest arguments in favor of privity are the identity, it's not just the identity of the claims, but the fact that the two work together and that the allegations against the two are absolutely in parallel. It is striking as well that the allegations that the FTC makes made in their motion for summary judgment to try to establish liability against modern media in the court below are essentially, I think, probative of the existence of, and were found by Judge Feist to be probative of the existence of that privity. Basically, the working together and the work on the common scheme, I think, to use his. Well, let me ask you, as a practical matter then, every single settlement with a primary target, because it includes a standard language, would kind of per se be a settlement with the ad agency, would it not? Well, not necessarily, Your Honor. And in fact, the FTC has taken steps since the Garvey case, or at least the summary judgment, to protect itself. The first thing is they are not using that robust definition of defendants anymore. By the way, the citations in the record are to the FTC website, specifically both the Blue Stuff and the Rexall Sundown settlements, so you can see the sort of, quote, new language that the FTC is using. Secondly, they are using a reservation of rights, my term, not theirs, language, this settlement is only with these defendants and it is not intended to bind anybody else in, other than these defendants. And so consequently, the broad definition of defendants is no longer available. Thirdly. But did your client actually have an indemnity policy? Not a policy, Your Honor. It was an indemnification clause in the agreement under which Modern Media agreed to perform these advertising services for Informant National. So, I mean, you had to scrounge around to get the money to pay off the Federal Trade Commission. Well, Informant National did, and Modern Media. You had no policy. No insurance policy. No, insurance policies do not cover this kind of liability. And Informant, I'm sorry, Modern Media contributed $500,000, this is in the record, to the $10 million that was paid by Informant National to the Federal Trade Commission as part of this settlement. Your Honor, I'm mindful of time and I was going to then turn to the Garvey part of this argument. I would begin by making two quick points, and that is that never in the history of the Federal Trade Commission Act has a spokesperson in a commercial been held liable in a litigated case. There have been some settlements with Pat Boone in the wonderfully named Kugamuga case and some others, but there has never been a litigated settlement. And, in fact, this case has drawn a fair amount of attention among the group in this city in New York that advises talent and spokespeople who are invited to participate in advertising. And if one thinks about it, it's easy to see why. It poses the issue, if you are a spokesperson or you're a celebrity of some sort and you are asked to participate in an ad, what is the duty? What should you do? What should your agent or lawyer insist that the advertiser do? I think that that's the critical question here. Now, what Garvey did is, Your Honor, as the Court is familiar, he tried it himself. His wife tried it herself. He looked at some substantiation. The FTC does not care for the adequacy of that substantiation. It is, as I believe he testified in the court below, it looked pretty good to a retired first baseman. And second, now, that was before the first infomercial. After the first infomercial, people came up to him in airports, he travels a fair amount, said, gee, this is wonderful stuff, we've been using it. And at the second infomercial, there were a bunch of people there who had tried it and had wonderful success. Was that, would that be sufficient for an advertiser? Plainly no. Absolutely not. But was it sufficient to meet the standard that was articulated by Judge Fease, and we suggest that it's the appropriate standard, that, and indeed it is the standard that the FTC in their brief, and I believe it's at page 34 of their brief. Are you talking about participant liability now or endorser liability? I'm talking about participant liability, Your Honor. I will come to the endorsement guides in a moment. The commission admitted in its brief, and I'm quoting here, that it must prove actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth. Now, that is actually from their brief, and we quote it in our brief. We agree that that is the appropriate standard. We think that this is a standard that absolutely reeks of factual determinations, and we believe that Judge Fease's findings, based on what Garvey did, that he either met or didn't meet that standard, is a finding that is not clearly erroneous. And we think that that is the standard that should apply here. It really comes down to the question of what should a spokesperson do. And what Judge Fease found, boiled down to its essentials, is Garvey, he wanted to make sure he was doing the right thing. That's why he took the product. That's why his wife took the product. They had results. Could he have gone out and hired a scientist or something like that? Could he have probed further? Perhaps he could have. Perhaps if it was Tiger Woods these days with a legion of lawyers, perhaps he would have been able to. But it was appropriate in terms of what Judge Fease thought the standard was. I would like briefly to turn to this question of the FTC endorsement guidelines, because I think there are a number of issues that are raised by the endorsement guidelines. First, the Commission itself realizes that these are guidelines. They are not rules. And, in fact, the rules, if I would characterize this as an effort by the Commission to have the force of rules attributed to guidelines, they really date from the days when the FTC did most of its enforcement, not in Federal court as they're doing now, but before an administrative law judge. And the guides basically explain the circumstances under which they would issue an administrative complaint. So the endorsement guides are not binding. But beyond that, there are two issues. And I think the first is that the endorsement guides say that an endorser is one who makes a statement that gives his own view with the product. I'm paraphrasing here. It's in the brief itself. But his own view of the product. And it's recognizable as being distinguished from the advertisers. And I suggest that looking at this, and Judge Feist found in looking at this, Garvey was clearly not giving an opinion that was separate from the advertiser. He was playing a role. He was there. He was the interrogator. He was the questioner. The interrogator sounds a little too formal, but he was asking the questions. Kennedy. I like the word reeks, too. He was asking questions. He had taken the product. His wife had taken the product. But this brings up the second thing. Why have endorsement guidelines? What is there about an endorsement that really merits separate treatment? I would argue that it is one of the most powerful forms of communication. In everyday life, you would ask a friend or an associate, have you been to the new restaurant? Have you seen the new movie? Yes, you can read one of the papers. They're not getting paid for that. They're not making money off of that. They're not making a million dollars off of that. That's right. And Garvey, here's the difference between what Garvey did and what an endorser does. What Garvey did was he was playing the role of somebody that was asking questions. An endorser, in my view, and I believe that this is the instinct of the guidelines, covers somebody that says, I've tried this product. It worked for me, and it will work for you, too. Tiger Woods with a golf club. I'm hitting it longer and straighter. That's the essence of an endorsement. With Garvey, you've got somebody who has tried the product. Why? To make sure that he is satisfied with it himself, but never in the program. And this was important to Judge Feist, and it comes through loud and clear in his opinion. I think it's important that never in the program does he talk about his personal experience. Yes, he's got things like, you convinced me. He doesn't? What about the thing where he says, my wife and I, you know, our family, we would never endorse a product that we don't believe in? Right. That was never in the infomercials. And what this case is about is the infomercials. Now, additionally, he went on a tour and did some very limited late-night sports talk radio and television. He was asked by the people in, the interviewers in there, well, have you tried it, or maybe he volunteered it. The FTC, in its complaint, doesn't refer to these things. I mean, they were delighted to find it, because it's Garvey talking about his own experience. They can't point to one sale that was ever made. I mean, this is about the infomercials that sold the $100 million worth of product. Well, no, isn't the question we have to decide. I mean, nobody disputes that he believes, you know, these were his personal views and opinions about this product, and he and his wife had used it to some degree. But then the question, isn't the question one of what level of substantiation or support does he have to have in an endorser capacity as opposed to a participant capacity? And do you and the FTC disagree about the standard of substantiation? I think we do. And, first of all, I would say two things. He's not an endorser, you know. But if he is an endorser, all he has to have is a reasonable belief in the truth of his statements. And that is the standard that is set forth in the endorsement guidelines that we claim don't apply. Now, if he is a spokesperson, not an endorser, in other words, he's recognized as essentially the spokesperson for the advertiser, then still the question is what standard is he held to? The FTC, in the language that I quoted from their brief, suggested a pretty harsh standard. I mean, actual fraud and, you know, conscious disregard and that kind of thing. Well, it's kind of odd because the guidelines, I think, circle back to saying he would have to have the same belief or substantiation that a direct advertiser would. It says in the guidelines, as I read them, which seem to... With reference, Your Honor, I believe what they say. What do they mean there? And what the interesting thing is, when you read those guidelines, it is never clear that the guidelines are intended to apply to an endorser, as opposed to the advertiser who is using an endorsement in its advertiser. Okay. I'm not here to argue that it wouldn't apply to an endorser, but when you look at that statement, the guidelines are clearly intended to apply to the advertisers, and they use them against advertisers all the time. It is the application of these to the endorser that is unique in this case. Thank you. Thank you. Rebuttal. Your Honor. Just quickly on the first point, I wanted to point out that it's all well and good for Modern Interactive to say post-facto that, oh, we would have paid part of the $10 million, or we even did pay a small part of the $1 million. But they're asking for a rule of law here, and I think to say that to adopt a rule of law that would make someone in their position who is merely an alleged co-conspirator liable for the first settlement is, you know, I think it speaks for itself that that is simply not going to happen. So what they must want is something which would be a non-mutual res judicata, which really would be unprecedented. I think I should talk a little bit more, if I have a minute or two, about the endorsement guidelines. Were you aware of the $500,000 they put into the kitty? Yes. That was not part of the settlement. They had no obligation vis-a-vis the settlement to do it. They apparently decided for their own business reasons to do it, and that's fine. They want to keep their contacts up. But, you know, they're advocating a rule of law under which someone in the same position could be gone after for the entire amount. Just quickly on the guidelines. I think the key insight of the guidelines is that there is a different kind of communication when someone endorses. And the guidelines are very clear that they refer to statements that are likely, consumers are likely to believe reflects the opinions, beliefs, findings, or experience. They were never intended to be limited to users. When Mr. Garvey gets on television, and regardless of how he gets there, he is saying by the end of the half hour, I truly believe. And particularly, even more so, when you go to the second infomercial. Let me ask you, just to cut to the chase. Yes. They had a trial here, which puts us in a little bit different situation. Are you saying that the judge applied the wrong legal standard, or are you saying that his findings, certain findings of fact, are clear errors? I think he applied the wrong legal standard because he appears to have gone on the erroneous notion that you have to be a user to do it. And, of course, Garvey was a user. I mean, was a user as to the additional appearances beyond the infomercials. But I do think the Court was wrong on that as a matter of law. And on the second point, I think whether or not someone falls with, you know, whether the character of the statements that Garvey made are such as to make him an endorser is, at the very least, a mixed question. And this Court has been quite clear that mixed questions are subject to de novo review. Now, I would have to ask. So the primary gripe, just so I understand it, is his findings. Is that right? Yeah. Yeah. I mean, certainly a finding that Garvey was not an endorser, you know, we would say it's a mixed question. The real question here is, is this enough? You know, is this enough to make you an endorser? And we would say that getting on television and saying, as he's at the beginning of the second infomercial, he says, I want to tell you about this project that I truly believe is the greatest breakthrough in diet history. That is an endorsement under the guidelines. Now, the guidelines were promulgated with notice and comment rulemaking. You know, Mr. Glynn is right. We have not brought many of these cases. We know some deference, but they don't have the force of law. They don't have force of law. But I would say we still get Chevron-type deference because we – what's really at issue here is what is the meaning of deception in the FTC Act? And the guidelines, although they were not meant to be force of law regulations, are still a definitive interpretation by the Federal Trade Commission of one part of what it means to be deceptive. And we would say, since that was done with notice and comment rulemaking, that does deserve Chevron deference. Yes, ma'am. And as for, you know, what Garvey needed to know, it's interesting that Mr. Glynn admits that this experience, this personal experience certainly was not – would not be enough for the advertiser. I think that the problem for endorsers is not as bad as Mr. Glynn would have it. What an endorser needs to do, particularly when he is faced with fairly extreme product claims that ought to raise some questions, he should go to the advertiser and say, what do you have to support this? We're not suggesting that Mr. Garvey had to fly spec. If they had had, you know, actual studies of the informal system, you know, as used by people under any sort of system, any sort of, you know, controlled circumstances, we're not expecting Mr. Garvey to fly spec and do methodological criticisms of the study. But there were no such studies. Well, it sounds like even as you lose on Mr. Garvey that you've shaken up the industry and had a certain impact on Section 5. That may be a good thing, Your Honor, but the result from this Court actually allowing us to get liability against an endorser would be far more important. Thank you, Your Honor. All right. Thank you very much. And the matter will stand submitted. Thank you for the arguments. They were both very helpful. Excellent. Thank you. Are we on the? Okay. All right. Clerk has got an announcement to make. So hear up or listen up. We're going to take a short break. All rise. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Pregerson, McKeown,bybee